

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
## for the
### Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>**CORN cellphone**<br>**Seized as FP&F No. 2024565400010405**<br>**("Target Device 2")** | ) ) ) ) ) ) ) Case No. '24 MJ3066 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A-2, incorporated herein by reference.

located in the _____Southern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 8, U. S. C. § 1324 | Alien Smuggling |

The application is based on these facts:
See Attached Affidavit of Border Patrol Agent Jason Larson, incorporated herein by reference.

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

U.S. Border Patrol Agent Jason Larson
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means)*.

Date: __08/12/2024__

*Judge's signature*

City and state: San Diego, California    HON. Barbara L. Major, U.S. Magistrate Judge
*Printed name and title*

# ATTACHMENT A-2

PROPERTY TO BE SEARCHED

The following property is to be searched:

CORN cellphone
Seized as FP&F No. 2024565400010405
**("Target Device 2")**

**Target Device 2** is currently in the custody of the Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

# ATTACHMENT B

## ITEM TO BE SEIZED

Authorization to search the cellular telephone described in Attachments A-1 and A-2 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of **July 17, 2024, through July 31, 2024**:

a. tending to indicate efforts to smuggle aliens from Mexico into the United States, and transport aliens inside the United States;

b. tending to identify accounts, facilities, storage Device, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which are evidence of violations of Title 8, United States Code, Section 1324.

# AFFIDAVIT

I, Jason Larson, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for a warrant to search the following electronic devices:

> Samsung cellphone
> Seized as FP&F No. 2024565400010404
> (**"Target Device 1"**)
>
> CORN cellphone
> Seized as FP&F No. 2024565400010405
> (**"Target Device 2"**)

Collectively, the **Target Devices**, as further described in Attachment A-1 and A-2, and to seize evidence of a crime, specifically, violations of Title 8, United States Code, Section 1324 (Alien Smuggling), as further described in Attachment B.

2. The requested warrants related to the investigation and prosecution of Juan Luis RAMOS-Iturbide, Christian VAZQUEZ-Navarro an Angel Francisco MUNGUIA, for attempting to transport and move illegal aliens Eloy DE JESUS-Bautista and Alwyn VASQUEZ-Lopez (collectively, the "Material Witnesses") within the United States. The **Target Devices** are currently in the custody of Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents. This affidavit is intended to show that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of the investigation into this matter. Dates and times are approximate.

1

## TRAINING AND EXPERIENCE

4. I have been employed by the USBP since 2011 and am currently assigned to the San Diego Sector Prosecutions Unit. I graduated from the Border Patrol Basic Academy at the Federal Law Enforcement Training Center in Artesia, New Mexico. I am a Federal Law Enforcement Officer within the meaning of Rule 41(a)(2)(C), Federal Rules of Criminal Procedure and have been a Federal Law Enforcement Officer for 13 years. I am authorized by Rule 41(a) Federal Rules of Criminal Procedure to make applications for search and seizure warrants and serve arrest warrants. I have experience and have received training with respect to conducting investigations of immigration and criminal violations of Titles 8, 18, 19, and 21 of the United States Code.

5. My current duties involve the preparation of criminal and administrative cases for prosecution, including the use of linking related subjects and information via electronic equipment and telephones. In the course of my duties, I investigate and prepare for prosecution cases against persons involved in the inducement, transportation, and harboring of illegal aliens into and within the United States; and, the utilization of illegally-obtained, counterfeit, altered or genuine immigration documents by illegal aliens to illegally gain entry or remain in the United States.

6. During my tenure as a Border Patrol Agent, I have participated in the investigation of a number of cases involving the smuggling of aliens from Mexico into the United States and transportation of illegal aliens within the United States, which have resulted in the issuance of arrest warrants, search warrants, seizure warrants, and the indictments of persons for alien smuggling, including drivers, passengers, and guides.

7. Through the course of my training, investigations, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational habits of alien smugglers and alien transporters, in particular those who attempt to smuggle aliens into the United States from Mexico and transport them throughout the Southern District of California. I am aware that it is a common practice for alien smugglers to work

in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators and/or illegal aliens in order to further their criminal activities. Because they are mobile, the use of cellular telephones permits alien smugglers and transporters to easily carry out various tasks related to their smuggling activities, including, *e.g.*, remotely monitoring the progress of the aliens while the aliens are in transit, providing instructions to transporters, guiding aliens to specific pick up locations, warning accomplices about law enforcement activity in the area and the status of check-point operations, and communicating with co-conspirators who guide aliens, coordinate drop off locations, and/or operate alien stash houses.

8. The smuggling of aliens generates many types of evidence, including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators and illegal aliens. For example, drivers and passengers responsible for transporting illegal aliens are typically in telephonic contact with co-conspirators immediately prior to and/or following the crossing of the illegal aliens at the border, at which time they receive instructions, including where to pick-up the illegal aliens for transportation into the United States and where to take the illegal aliens after crossing into the United States. These communications may also include locations for delivery to stash houses and/or sponsors. Illegal aliens also are typically in telephonic contact with co-conspirators prior to and following their crossing in order to make smuggling arrangements, receive instructions, and report their locations after crossing. It is common for alien smugglers to be in contact with co-conspirators weeks to months in advance of an event to recruit drivers and to coordinate the event. It is also common for co-conspirators to continue to contact each other by phone calls, social media, or messaging applications when contact is lost with the driver after an apprehension has occurred.

3

9. Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. In particular, in my experience and consultation with law enforcement officers experienced in alien smuggling investigations, I am aware that individuals engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

10. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

    a. tending to indicate efforts to smuggle aliens from Mexico into the United States, and transport aliens inside the United States;

    b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

    c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

    d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

    e. tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

    f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

11. On July 31, 2024, (A)Border Patrol Agent-Intelligence F. Hurtado, Supervisory Border Patrol Agent J. Castillo, and Border Patrol Agents A. Gaspar and E. Hunt were performing assigned duties in the Chula Vista Border Patrol Stations area of responsibility. All agents were dressed in plain clothes wearing their agency badge and driving unmarked service vehicle with emergency equipment.

12. At approximately 11:00 AM, Agent Hurtado was notified by (A) Border Patrol Agent-Intelligence A. Djokich of the location of a person of interest identified as defendant Christian Jair VAZQUEZ-Navarro. VAZQUEZ was recently released from ICE custody with a GPS wristband monitor. Agent Hurtado responded to the VAZQUEZ location at the Hilltop Park located at the 700 Block of Hilltop Drive in Chula Vista, California and observed VAZQUEZ near a black Audi with three other individuals. Soon after Agent Hurtado observed a silver Nissan Sentra parking next to a gray VW GOLF GTi. Agent Hurtado observed the Audi leave the park and VAZQUEZ and another individual walking over and greeting the driver of the Sentra. Agent Hurtado observed VAZQUEZ and the Sentra driver exchange backpacks and multiple individuals began to emerge from an overgrown hedge and enter the Sentra. Agent Hurtado believed a smuggling event was transpiring and informed agents via service radio of his observations. Agent Hurtado informed agents that VAZQUEZ was driving the Golf GTi.

13. At approximately 11:18 AM, Agent Gaspar responded to the area and he and Agent Hurtado activated their emergency equipment to stop both vehicles from leaving the park. Agent Hurtado approached the Golf GTi and observed the front passenger abscond from the vehicle and VAZQUEZ failed to yield and left the park. Agent Gaspar was able

5

to stop the Sentra and approached and detained the driver later identified as defendant Juan Luis RAMOS Iturbide. Agent Gaspar conducted an immigration inspection of the three rear passengers later identified as material witnesses Eloy Jacobo DE JESUS-Bautista, Luis Carlos RINCON-Hernandez and Aylwin Abimelic VASQUEZ-Lopez. DE JESUS stated he is a citizen of Mexico and RINCON and VASQUEZ stated that they are citizens of Guatemala without proper documents allowing them to enter or remain in the United States legally. At approximately 11:37 AM, Agent Gaspar placed DE JESUS, RINCON, and VASQUEZ under arrest and at approximately 11:38 AM, placed RAMOS under arrest.

14.   At the time of arrest, a Samsung cellphone (Target Device 1), was found in DE JESUS' front pant pocket and a CORN cellphone (Target Device 2) was found in VAZQUEZ' front pocket. DE JESUS and VAZQUEZ stated the Target Devices belonged to them. Both devices were subsequently seized.

15.   At approximately 12:15 PM, agent Castillo arrived at the park and began to assist Agent Hurtado and Gaspar and was approached by a civilian stating that they saw three suspicious individuals in the park. Agent Castillo encountered four individuals and conducted an immigration inspection on all four individuals who stated that they were citizens of Mexico without the proper documents to enter or remain in the United States legally. At approximately 12:20 PM, Agent Castillo placed all four individuals under arrest.

16.   While the events were transpiring at Hilltop Park, Agent Djokich informed ICE officers that he needed to locate VAZQUEZ due to his involvement in the alien smuggling event at the park. ICE officers informed Agent Djokich with VAZQUEZ' location as he moved through the City of Chula Vista. At approximately 12:15 PM, ICE officers informed Agent Djokich that VAZQUEZ was at a restaurant located at the 200 Block on Broadway in Chula Vista, California. At approximately 12:20 PM, Agent Djokich located VAZQUEZ sitting at a restaurant, approached VAZQUEZ identified

himself as a Border Patrol Agent and placed him under arrest. Agent Hunt who had tried to pursue the Golf GTi when it left the park was able to locate the vehicle.

17. Defendant, Christian VAZQUEZ-Navarro, was advised of his Miranda rights. VAZQUEZ stated he understood his rights and agreed to speak without an attorney present. VAZQUEZ stated he was contacted on July 31, 2024, at approximately 8:00 AM, by individual A, requesting his help. VAQUEZ stated that he then contacted a friend, Individual B, to give him a ride. VAQUEZ stated Individual B arrived in a green GTI Volkswagen and drove him to a hotel near Dairy Mart Road. VAZQUEZ stated upon their arrival, he observed an undercover police vehicle pull up behind them as Individual B sped away. VAZQUEZ explained that he told Individual B to stop the vehicle, but Individual B did not and was able to abscond from the undercover police vehicle.

18. VAZQUEZ then stated he and Individual B arrived at a park and approximately 15-20 minutes later, Individual A arrived with four individuals in his vehicle. VAZQUEZ stated that Individual A asked he and Individual B to take the individuals. VAZQUEZ explained that he told Individual A he did not want anything to do with the individuals, at which point Individual A told the individuals to exit his vehicle and hide in the bushes. VAZQUEZ stated he asked to borrow Individual B' vehicle to take his wife to the doctor. VAZQUEZ then stated that before leaving the park, he overheard Individual B make a call to an unknown individual to come and pick up the individuals. VAZQUEZ stated he saw undercover police close in on Individual B and the individuals as he was leaving the park and observed an undercover police vehicle behind him with activated lights and siren. VAZQUEZ stated he sped away and was able to abscond from the police vehicle then drove to a tire shop located on E Street, where he parked one block away. VAZQUEZ stated he then walked over to a nearby business and ordered some food. VAZQUEZ explained he was arrested while waiting for his food.

19. Material witness Eloy Jacobo DE JESUS-Bautista stated that he is a citizen of Mexico without any immigration documents that would allow him to enter or remain in the

7

United States legally. Material witnesses Luis Carlos RINCON-Hernandez and Aylwin Abimelec VASQUEZ-Lopez sated that they are citizens of Guatemala without any immigration documents that would allow them to enter or remain in the United States legally. All three witnesses stated that smuggling arrangements were made prior to crossing into the United States. DE JESUS and RINCON stated that they were to pay between $7,000-9,000 USD and VASQUEZ was to pay $70,000 MXN if successfully smuggled into the United States.

20. All three stated that they crossed into the United States utilizing a ladder. They stated that they were instructed by a smuggler to run directly north of the fence where vehicle would be waiting to pick them up. All three stated that they got into a vehicle and were taken to a park where they were instructed to wait. After a couple hours they stated that another vehicle arrived and were instructed to get into the vehicle. All three stated that they were arrested as they got into the vehicle.

21. All three were shown two photographic lineups and identified defendant Juan Luis RAMOS Iturbide as the driver and defendant Christian VAZQUEZ-Navarro as the passenger of the vehicle.

22. Based upon my experience and training, consultation with other law enforcement officers experienced in human trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures, and other digital information are stored in the memory of the **Target Devices**. In light of the above facts and my experience and training, there is probable cause to believe that the Defendant and Material Witness were using the **Target Devices** to communicate with others to further illegal entry into the United States. Based on my training and experience, it is also not unusual for individuals, such as the Defendants, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for

weeks and months longer than they claim. Accordingly, I request permission to search the **Target Devices** for data beginning on **July 17, 2024**, through **July 31, 2024.**

## METHODOLOGY

23. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the devices are subscribed, and the nature of the data stored on the devices. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

24. Following the issuance of these warrants, a case agent familiar with the investigation will collect the subject cellular telephones and subject them to analysis. All forensic analysis of the data contained within the telephone and its memory cards will

9

employ search protocols directed exclusively to the identification and extraction of data within the scope of these warrants.

25. Based on the foregoing, identifying, and extracting data subject to seizure pursuant to these warrants may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

### PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

26. Law enforcement has not previously attempted to obtain the evidence sought by these warrants.

### CONCLUSION

27. Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Devices** will yield evidence of an alien smuggling violation of Title 8, United States Code, Sections 1324.

28. Because the **Target Devices** were seized at the time of material witnesses arrest and have been securely stored since that time, there is probable cause to believe that such evidence continues to exist on the **Target Devices**. As stated above, I believe that the appropriate date range for this search is from **July 17, 2024, through July 31, 2024.**

//

//

//

//

10

29. Accordingly, I request that the Court issue warrants authorizing law enforcement to search the item described in Attachments A-1 and A-2 to seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Jason Larson
Border Patrol Agent

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 12th day of August 2024.

_____
HON. BARBARA L. MAJOR
United States Magistrate Judge